# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| Adventus Americas Inc., and<br>EnviroMetal Technologies, Inc. | )<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | 06 CV 3267 |
| Innovative Environmental<br>Technologies, Inc., | )<br>)<br>) | |
| Defendant. | )<br>) | |

## MEMORANDUM AND ORDER

Defendant Innovative Environmental Technologies, Inc. ("IET") moves to dismiss under Federal Rules of Civil Procedure 12(b)(1), (2) and (3) asserting this court lacks subject matter jurisdiction because neither of the plaintiffs have standing, this court cannot exercise personal jurisdiction over it and that venue is improper. Alternatively, IET moves, pursuant to 28 U.S.C. § 1404(a), to transfer this case to the United States District Court for the Eastern District of Pennsylvania. For the following reasons, IET's Rule 12(b)(1) motion to dismiss is granted in part and denied in part and its Rule 12(b)(2) and (3) motions to dismiss are denied. However, IET's motion to transfer to the Eastern District of Pennsylvania is granted.

## I.  Background

Plaintiffs Adventus Americas Inc. ("Adventus") and EnviroMetal Technologies, Inc. ("EnviroMetal") bring this patent infringement suit against IET for infringement of U.S. Patent No. 5,266,213 ("'213 Patent"). The '213 Patent, owned by the University of Waterloo, Ontario ("University"), a non-party, is a process patent for environmental remediation titled "Cleaning Halogenated Contaminants from Groundwater." Plaintiffs filed suit against IET, a Pennsylvania corporation with its principal place of business in Pipersville, Pennsylvania, after they became aware of an allegedly infringing process utilized by IET in its remediation services. Specifically, plaintiffs claim that "any process that cleans halogenated organic contaminants from groundwater in an aquifer that employs an underground 'body of metal' through which the aquifer passes"

likely infringes the '213 Patent. EnviroMetal, a Canada corporation with its principal place of business in Ontario, Canada, is an exclusive licensee under the '213 Patent. Its co-plaintiff, Adventus, a Delaware corporation with its principal place of business in Freeport, Illinois, is a non-exclusive sub-licensee in the United States of the '213 Patent.

## II. Discussion

### A. 12(b)(1) Motion to Dismiss

IET first seeks to dismiss this case on the grounds that neither plaintiff has standing. The Patent Act of 1952 provides "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. §281 (1988). The term patentee includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). In addition to the patentee and its assignees, an exclusive licensee holding all substantial rights under the patent is also entitled to bring suit in its own name. *Textile Prod., Inc. v. Mead Corp.,* 134 F.3d 1481, 1484 (Fed. Cir 1998). For all intents and purposes, then, such a licensee is an assignee. *Id*. Thus, the "proper focus is on the substance of what was granted" to determine whether an exclusive licensee has standing to bring a suit for infringement in its own name without joining the patentee. *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 1250 (Fed. Cir. 2000).

While an exclusive licensee may have standing to bring suit, "[i]t is well settled that a non-exclusive licensee of a patent has no standing to sue for infringement." *Kalman v. The Berlyn Corp.*, 914 F.2d 1473 (Fed. Cir. 1990); *Abbott Lab. v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995) ("[B]are licensee, who has no right to exclude others from making, using, or selling the licensed products, has no legally recognized interest that entitles it to bring or join an infringement action."). A non-exclusive licensee's lack of standing is based on the fact that a non-exclusive licensee suffers no legal injury from infringement. *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995); *Sicom Sys. Ltd v. Agilent Tech.*, 427 F.3d 971, 976 (Fed Cir. 2005). In fact, a non-exclusive license "grants to the licensee merely a

privilege that protects him from a claim of infringement by the owner of the patent monopoly." *Ortho Pharm.*, 52 F.3d at 1031 (citations omitted).

### 1. Adventus' Standing

IET contends that Adventus lacks standing because it is a mere, non-exclusive sub-licensee to the '213 Patent. The plaintiffs do not dispute this and do not cite any applicable authority to convince the court that Adventus may join the lawsuit as a co-plaintiff. Accordingly, the court finds that Adventus lacks standing to bring suit.

### 2. EnviroMetal's Standing

As to EnviroMetal's standing, the court must determine whether the exclusive license between the University of Waterloo and EnviroMetal conferred substantial rights in the patent to EnviroMetal. *See Textile Prod.*, 134 F.3d at 1484 ("Determining whether a licensee is an exclusive licensee or a bare licensee is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant."). EnviroMetal asserts that it obtained all substantial rights in the '213 Patent. In support, EnviroMetal relies on the License Agreement for Groundwater Treatment between EnviroMetal Technologies Inc. and University of Waterloo ("License") stating that the License grants the following substantial rights: (1) an exclusive license to use, install, market, sub-license, establish distribution and sell; (2) a worldwide territory to practice the invention until the last expiration date of the issued patents; (3) the responsibility for payment of one hundred percent of all patent costs required to obtain or maintain all existing and future patents; (4) a requirement that the licensee indemnify and hold harmless the University from any claims or lawsuits alleging the applicable patents infringe another's patents; and (5) an obligation to incur all necessary costs to commence legal action against any and all infringers where there is reasonable expectation that a repeated and unabated infringement may lead to detrimental loss.

Unsurprisingly, IET counters that EnviroMetal does not have an exclusive license and, even if it did, it does not have substantial rights in the '213 Patent. To that end, IET argues that the University did not transfer to EnviroMetal the right to refrain from suing thereby leaving EnviroMetal without the full complement of enforcement rights. In addition, IET contends that certain rights retained by the University, including a right to use the '213 Patent and the right to approve further assignment of the License, further weighs against a finding of substantial rights. Finally, IET claims that EnviroMetal's license is subject to licenses that the University has already conveyed to DuPont Inc. ("DuPont") and General Electric Company ("General Electric") in the same geographic territory. For the following reasons, the court disagrees with IET's characterization of the facts and its conclusion that EnviroMetal is not an exclusive licensee with substantial rights in the '213 Patent.

### a. Exclusive License

Importantly, the University explicitly gives EnviroMetal an "exclusive" license to "use, install, market, sub-license, establish distribution and sell." License 2.1. Of the bundle of rights transferred, "[a] licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1380 (Fed. Cir. 2000). Here, there is no limiting language in the License suggesting that EnviroMetal's right to sub-license is encumbered.

Unable to hang its hat on any sub-licensing issue, IET turns to the provision relating to EnviroMetal's right to assign the License. IET contends that because EnviroMetal's right to assign the License is subject to the written consent of the University, EnviroMetal cannot possess substantial rights in the patent. However, the Federal Circuit has held that where such a consent requirement is reined in by an agreement that consent shall not be withheld unreasonably, the provision is not fatally restrictive of the scope of the exclusive licensee's rights. *Speedplay*, 211 F.3d at 1252. Here, in a section of the License referring to assignment, the License provides that written consent of the University "shall not be unreasonably withheld." *See* License 5.2(c), 6.0.

In addition, the written consent requirement for assignment runs to both EnviroMetal and the University - the University may not assign the License without EnviroMetal's written consent either. *See* License 6.2.

In sum, EnviroMetal's unencumbered right to sub-license coupled with only a slight restriction on the right to assign, support a conclusion that the University intended to transfer all substantial rights in the '213 Patent to EnviroMetal.

### b. Right to Sue

The transfer of the right to sue is "particularly dispositive" of the question of whether an exclusive licensee is authorized to bring suit without joining the patentee. *Abbott Lab.*, 47 F.3d at 1132 (quoting *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875-76 (Fed. Cir. 1991)). Here, the License specifically provides that "EnviroMetal shall have the obligation to incur all necessary costs to commence legal action against any and all infringers where there is a reasonable expectation that a repeated unabated infringement may lead to detrimental loss...." License 2.9(a). Critically, EnviroMetal is given discretion in commencing legal action and has the obligation to sue if it determines that there is a reasonable expectation of detrimental loss. Put differently, if EnviroMetal determines that there is *no* reasonable expectation of detrimental loss, it has the right to refrain from commencing litigation. Contrary to IET's arguments, Section 2.9 does not explicitly distinguish between commercial and non-commercial infringement and the court therefore relies on the clear language of the License. *See* License 2.9 ("EnviroMetal shall have the obligation to incur all necessary costs to commence legal action against any and all infringers where there is a reasonable expectation that a repeated unabated infringement may lead to detrimental loss....")

The policy rationale underlying the importance placed on the right to sue is to prevent multiple lawsuits on the same patent against a single infringer. *Aspex Eyewear, Inc. v. Miracle Optics, Inc.,* 434 F.3d 1336, 1343 (Fed. Cir. 2006). Here, there is no danger of that occurring. EnviroMetal possesses the right to enforce the patent and the first obligation to sue parties for

infringement. The University can only sue for infringement in the event EnviroMetal fails to do so. *Compare Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016 (Fed. Cir. 2001) (finding patentee retained substantial and significant rights where it had the first obligation to sue for infringement). Moreover, the License explicitly manifests the University's desire to refrain from participating in infringement suits brought by EnviroMetal. Indeed, the University "agrees to take all required actions within its power to grant EnviroMetal...the right to independently prosecute an infringer." License 2.9(a). Therefore, the very terms of the License ensure that a single infringer will not be subject to multiple lawsuits.

After consideration of the language of the License transferring the right to sue and the policy rationale supporting its transfer, the court finds that the University intended to transfer the exclusive right to sue to EnviroMetal. This strongly favors a finding of a transfer of substantial rights in the '213 Patent to EnviroMetal.

### c. Rights Retained by University

IET next contends that the University's retention of ownership and use rights undermines a finding of substantial rights. However, EnviroMetal argues that given the substantial rights transferred by the University to EnviroMetal, the University's retention of ownership in the patent makes the University an owner in name only. *See* License 2.7. Admittedly, the central issue in determining standing to sue for patent infringement is who owns the patent. *Aspex Eyewear,* 434 F.3d at 1341. Indeed, in assessing whether the patentee or the licensee was the owner of the patent, the Federal Circuit has held that where a licensee's substantial rights were only valid for a limited period of time, the patentee was the true owner of the patent. *Id.* at 1342. For example, in *Aspex Eyewear*, the licensee had nearly all of the substantial rights to favor a finding of an assignment: the exclusive right to make, use and sell; (2) the right to sue for infringement; and (3) a virtually unrestricted authority to sub-license. *Id.* However, the licensee's rights were only valid for a short period of time, upon expiration of which all rights would be regained by the patentee. *Id*. at 1342-43 ("By having rights for only a limited portion of

the patent term, it simply did not own the patent."). In contrast, in this case, there is no limitation as to time placed on EnviroMetal's substantial rights. The License is valid until the last expiration date of the issued patents and no portion of the patent term is carved out as a reversionary right. Moreover, as discussed above, all of the rights that the *Aspex Eyewear* court found to "strongly favor" a substantial transfer of rights are present here.

The court acknowledges that in addition to "ownership," the University has retained non-commercial research investigatory rights. These research rights, however, are not the same type of "use" rights the Federal Circuit has held amount to a failure to transfer all substantial rights to a licensee. *See Abbott Lab.*, 47 F.3d at 1132 (finding no transfer of substantial rights where patentee reserved right to make and use the patented products for its own benefit and the right to sell those products to parties with whom the patentee had pre-existing contracts). Accordingly, the ownership and use rights retained by the University do not rise to a level depriving EnviroMetal of substantial rights in the '213 Patent.

### d. Existing Licenses to DuPont and General Electric

Finally, as to the existing licenses to DuPont and General Electric, a careful reading of the License reveals that both companies are sub-licensees of EnviroMetal, not as IET asserts, licensees of the University.[1] As such, IET's argument that the license to EnviroMetal cannot be exclusive because of existing licenses to DuPont and General Electric is without merit and without consequence as to whether EnviroMetal possesses substantial rights in the '213 Patent.

---

[1] The License provides:

> With the exception of the Research License(s), Research Sub-licenses(s), and the use of certain elements of The Technologies by DuPont Inc. and General Electric Company, as specified in each of their respective *research contracts with EnviroMetal* (other than the specific limitations set out in Articles 2.4 c, d, e and f), EnviroMetal agrees to pay the University a Royalty on ETI Sales as specified hereinafter.

(License 2.4) (emphasis added).

Based on the foregoing analysis, the court finds that EnviroMetal is an exclusive licensee with substantial rights in the '213 Patent. Therefore, EnviroMetal has standing to bring this action in its own name without joining the University.

**B.      12(b)(2) Motion to Dismiss**

IET also seeks to dismiss this action for lack of personal jurisdiction. In ruling on a motion to dismiss pursuant to Rule 12(b)(2) based on lack of personal jurisdiction, the court may consider matters outside the pleadings, such as affidavits and other materials submitted by the parties. *See* FED. R. CIV. P. 12(b). The plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987). In making its determination regarding personal jurisdiction the court must resolve any factual disputes in the plaintiff's favor, but must accept the allegations in the complaint as true only to the extent that they are not controverted by other evidence in the record. *Id*. The court must also accept uncontested jurisdictional facts presented by the defendants as true. *Connolly v. Samuelson*, 613 F. Supp. 109, 111 (N.D. Ill. 1985).

To determine whether the court has personal jurisdiction over a non-resident defendant in a patent case, the court applies "the law of the federal circuit rather than that of the regional circuit in which the case arose." *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359 (Fed. Cir. 2001) (quoting *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995)); *David White Instruments, LLC. v. TLZ, Inc.*, No. 02 C 7156, 2003 U.S. Dist. LEXIS 8375 at *9 (N.D. Ill. May 16, 2003). The district court may exercise personal jurisdiction over the defendant in a patent infringement case if (1) jurisdiction exists under the state long-arm statute and (2) exercise of jurisdiction would be consistent with the limitations of the due process clause. *Trintec Indus. v. Pedro Promotional Prods.*, 395 F.3d 1275, 1279 (Fed. Cir. 2005) (citations omitted). Under the Illinois long-arm statute, Illinois state courts have general jurisdiction over nonresident defendants "doing business" in Illinois and specific jurisdiction over nonresident defendants if the claims arise from their "transactions" in Illinois. 735 ILCS §§ 5/2-209(a) & (b). Because Illinois' long-

arm statute extends to the maximum extent permitted by the Illinois and United States Constitutions, jurisdiction under the long-arm statute is coextensive with federal due process requirements. 735 ILCS 5/2-209(c); *see, e.g.*, *RAR, Inc. v. Turner Diesel Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution limits when a state may assert personal jurisdiction over nonresident defendants. *Pennoyer v. Neff*, 95 U.S. 714, 733 (1878). To exercise personal jurisdiction consistent with federal due process, a defendant must have (1) "certain minimum contacts with the forum state such that (2) the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Under the "minimum contacts" test, a defendant may be subject to either specific or general jurisdiction. Specific jurisdiction refers to jurisdiction over a defendant if a suit "arises out of" or "relates to" the cause of action even if those contacts are "isolated and sporadic." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985). General jurisdiction is applicable when the lawsuit neither arose from nor was related to the defendant's contacts with the forum state. *RAR, Inc.*, 107 F.3d at 1277. Such jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the state. *Id*. Since IET did not perform remediation services in Illinois using the process alleged to infringe the '213 Patent, the court must determine whether IET's contacts with Illinois are such that the district court could exercise general jurisdiction over it.

### 1. General Jurisdiction and Minimum Contacts

For general jurisdiction to exist, IET's "contacts must be so extensive to be tantamount to [a defendant] being constructively present in the state to such a degree that it would be fundamentally fair to require it to answer in an [Illinois] court in any litigation arising out of any transaction or occurrence taking place anywhere in the world." *See Purdue Research Found. v.*

*Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003). This is "a fairly high standard requiring a great amount of contacts." *Jamik, Inc. v. Days Inn of Mount Laurel*, 74 F. Supp. 2d 818, 822 (N.D. Ill. 1999).

Factors courts examine in determining whether general jurisdiction exists include: (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an agent for service of process in the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

Here, IET argues that it does not have sufficient contacts in Illinois to subject it to jurisdiction because it currently has no office, residence or property in Illinois, it has never resided in Illinois, it pays no taxes in Illinois, it maintains no telephone listing, bank account or employees in Illinois, and its sales contacts in Illinois have been minimal and sporadic. However, the court finds that IET's contacts with Illinois are sufficient to cause it to reasonably anticipate being haled into court in Illinois. *See RAR, Inc.,* 107 F.3d at 1277. Although IET performed remediation services at four locations in Illinois, each of these did not involve a single, isolated or sporadic visit to the state. In fact, according to IET's own press release, prominently placed on its website, IET's relationship with a former gas station in Roseville, Illinois, approximately lasted a year and a half. Pl. Opp. 8. IET itself identifies Illinois as one of only seven states where it "has provided remediation services since 1998 for more than 50 major commercial and residential projects." *Id.*

Although IET has failed to elaborate on the length of its other projects in Illinois, the court is led to conclude, based in part on information provided in the press release regarding the remediation performed in Roseville, Illinois, that a remediation project does not merely involve a

quick stopover in the state. In order to remediate a field site, IET must send its employees and agents into the field - environmental remediation is an on-the-ground, hands-on business necessitating a few days at the site and possible repeated contacts with a project site until the remediated site meets treatment standards for impacted soils and groundwater. *See* Def. Reply 10. Further, IET admits that it has solicited business in Illinois. In fact, IET submitted a quote for remediating a field site in Freeport, Illinois to Dr. James G. Mueller, President of Adventus, but was not selected to perform the remediation. *See* Def. Reply, Supp. Dec. of M. Scalzi. Finally, although IET no longer maintains an office, telephone listing or employee in Illinois, at one time it did - thus, this is not a case where the defendant has never done business in Illinois, maintained an office in Illinois or never held a telephone listing in Illinois. *See* Def. Reply, Supp. Dec. of M. Scalzi*; see also Jamik, Inc.*, 74 F. Supp. 2d at 822. IET's contacts with Illinois sufficiently rise to the level of "minimum contacts" as required by due process. However, before the court may exercise personal jurisdiction over IET, it must engage in the second part of the federal due process analysis: whether exercising personal jurisdiction comports with fair play and substantial justice.

### 2. Traditional Notions of Fair Play and Substantial Justice

Federal due process requires that the exercise of personal jurisdiction over a nonresident defendant be reasonable. *Int'l Shoe*, 326 U.S. at 316. Factors which courts consider when determining the reasonableness of exercising personal jurisdiction over a nonresident defendant include the state's interest in providing a forum to the plaintiff, the burden of defense on the defendant, the burden of prosecution elsewhere on the plaintiff, the extent to which the claim is related to the defendant's local activities, and the avoidance of a multiplicity of suits. *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 115 (1987); *Burger King Corp.*, 471 U.S. at 472-73. The most important factors to consider are the interests of the forum and the relative convenience of litigating in that forum. *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 700 (N.D. Ill. 2002).

It would not be unduly burdensome for IET to litigate in Illinois given the developments in technology enabling easy transportation and communication. *See Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 840 (N.D. Ill. 2000) (modern advances in transportation and communication make it more reasonable to litigate in a foreign forum). Exercising personal jurisdiction over IET in this case would be reasonable because it has purposefully availed itself of Illinois through the various remediation services performed and solicited within the state's borders. Moreover, while the infringement complained of by plaintiffs did not take place in Illinois, IET's activities in Illinois at least fall under the umbrella of remediation services therefore relating plaintiffs' claims to IET's local activities. Accordingly, IET's motion to dismiss for lack of personal jurisdiction is denied.

### C.  12(b)(3) Motion to Dismiss

In conjunction with its Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, IET also moves to dismiss under Rule 12(b)(3) for improper venue. In patent cases, venue is governed by 28 U.S.C. § 1400(b), which reads, "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and had a regular and established place of business." 28 U.S.C. § 1400(b). For the purposes of the patent venue statute, a non-resident corporate defendant "resides" in "any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c); *see Trintec Indus.*, 395 F.3d at 1280. Since IET is subject to personal jurisdiction in this forum, venue is proper here. IET's motion to dismiss for improper venue is, therefore, denied.

### D.  Motion to Transfer

Finally, in the alternative to dismissal for lack of personal jurisdiction, IET moves to transfer this action pursuant to 28 U.S.C. § 1404(a), which provides that, "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." A decision to transfer

an action is committed to the district court's sound discretion. *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 (7th Cir. 1986).

Under § 1404(a), the party seeking transfer must demonstrate that (1) venue is proper in the transferor court; (2) venue would be proper in the transferee court; and (3) transfer will serve the convenience of the parties and witnesses and promote the interests of justice. *See, e.g., Mattson v. Gerry Wood Prod., Co.*, No. 95 C 2314, 1997 WL 158334 at *1 (N.D. Ill. Mar. 31, 1997). In evaluating the third prong - the convenience and fairness of the proposed transfer - the court considers relevant private and public interests. In addition, the movant may also demonstrate, "by reference to particular circumstances, that the transferee forum is clearly more convenient." *Coffey*, 796 F.2d at 219-20.

The first two prongs of the § 1404(a) analysis are satisfied, as it is undisputed that venue is proper in this district as well as the proposed transferee district. Thus, the court will focus on the third prong: whether transfer will serve the convenience of the parties and witnesses and promote the interests of justice.

1. **Private Interest Factors - Convenience of the Parties and Witnesses**

The convenience of the witnesses and the parties is the most important § 1404(a) factor. *Dunn v. Soo Line R.R. Co.*, 864 F. Supp. 64, 65 (N.D. Ill. 1994). When evaluating this factor, the court considers (1) the plaintiffs' choice of forum; (2) the situs of material events; (3) the availability of evidence in each forum; (4) the convenience of the witnesses; and (5) the convenience of the parties litigating in the respective forums. *Plotkin v. IP Axess, Inc.*, 168 F. Supp. 2d 899, 902 (N.D. Ill. 2001); *Houck v. Trans World Airlines, Inc.*, 947 F. Supp. 373, 375 (N.D. Ill 1996). The court also considers whether the parties have met their burden of specifically identifying the witnesses they intend to call, as well as the general content of the witnesses' proposed testimony. *See Mattson*, 1997 WL 158334 at *1 (collecting cases).

### a. Plaintiffs' Choice of Forum

Here, plaintiffs filed suit in Illinois. Standing alone, this fact militates against transfer. However, "where the plaintiff's choice of forum has a relatively weak connection with the operative facts giving rise to the claim or is not the plaintiff's home forum, the deference traditionally given to the selection is lessened." *Brady v. Hanger Orthopedic Group, Inc.*, No. 05 C 0492, 2006 U.S. Dist. LEXIS 66112 at *5 (N.D. Ill. Aug. 30, 2006) (citing *Von Holdt v. Husky Injection Molding Sys., Ltd.*, 887 F. Supp. 185, 188 (N.D. Ill. 1995)). Further, in the face of such a weak relationship, the plaintiffs' choice of forum becomes "only one of the many factors the court considers." *D'Ancona & Pflaum LLC v. M2 Software, Inc.*, No. 00 C 7150, 2001 U.S. Dist. LEXIS 11375 at *5 (N.D. Ill. Aug. 2, 2001).

Here, the connection with Illinois is relatively weak. The only remaining plaintiff with standing - EnviroMetal - is a Canada corporation with its principal place of business in Ontario. Therefore, the plaintiff is not in its home forum. In addition, as discussed below, there is no nexus between this district and the operative facts giving rise to the cause of action. Further, plaintiffs have not demonstrated that the events giving rise to the claims have a strong connection to the Northern District of Illinois. Accordingly, the court will give minimal weight to plaintiffs' choice of forum.

### b. Situs of Material Events

IET maintains that the situs of material events - the remediation services that are alleged to infringe the '213 Patent - is Cincinnati, Ohio. However, in support of a transfer to the Eastern District of Pennsylvania, IET argues that in patent infringement cases the focus is on the infringer, its employees and its documents. Indeed, "the location of the infringer's principle place of business is often the critical and controlling consideration because such suits often focus on the activities of the alleged infringer, its employees, and its documents rather than upon those of the plaintiffs." *Tech. Concepts L.P. v. Zurn Indus.*, No. 02 C 5150, 2002 U.S. Dist. LEXIS 21020 (N.D. Ill. Oct. 31, 2002) (citations omitted). IET is incorporated in Pennsylvania and its

principal place of business is in that state. All records relating to the development and use of the alleged infringing method are located in Pennsylvania. While these records could easily be transported to another jurisdiction, they are already located in the proposed transferee district. Critically, however, there are no material events or documents alleged to be located in Illinois. In addition, no party with standing resides or is located in Illinois. Given the concentration of IET's employees and business records, and the emphasis placed on the alleged infringer's principal place of business in patent infringement cases, this factor weighs in favor of transfer.

### c. Availability of Evidence

As discussed above, IET asserts that all of its records relevant to plaintiffs' cause of action are located in Pennsylvania. Plaintiffs do not rebut this argument, but state that technological advances have dramatically increased the accessibility of records located in other jurisdictions and that therefore this factor weighs only slightly in the analysis. However, the comparison of evidence located in Pennsylvania and Illinois weighs solidly in favor of Pennsylvania given that there is likely no evidence located in Illinois because of Illinois' tenuous relationship to the operative facts in this case. Although technology has made the exchange of documents easier and cost effective, given Illinois' weak connection to the matter, this factor favors transfer. *See Coolsavings.com, Inc. v. IQ.Commerce Corp.*, 53 F. Supp. 2d 1000, 1006 (N.D. Ill. 1999).

### d. Convenience of the Witnesses

To satisfy this factor, the movant must specify the key witnesses to be called and make a general statement of the nature of their testimony. *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167-68 (N.D. Ill. 1995). In considering this factor, "a court should look to the nature and quality of the witnesses' testimony with respect to the issues of the case," rather than being swayed by the length of a party's witness list. *See id.*; *see also Plotkin*, 168 F. Supp. 2d at 904.

Here, IET states that its employees and witnesses reside in Pennsylvania, but fails to provide any additional details, such as the names of any key witnesses or the nature of their testimony. In addition, IET generally discloses that it "plans on calling several third-party witnesses." Def. Mem. 11. IET identifies one of these third-party witnesses by name: Attorney Gregory Gore. *Id.* According to IET, Attorney Gore's testimony will be relevant for the purposes of enhanced damages. *Id.* Specifically, Attorney Gore's opinion that IET's process does not infringe the '213 Patent will serve to "vitiate EnviroMetal's claim that IET's infringement is 'exceptional.'" Def. Mem. 11. In addition, IET identifies one corporation, BASF Corporation, with an office in Pennsylvania, from which IET intends to call one or more witnesses. *Id.* Although, IET informs the court of the nature of its relationship with BASF Corporation (BASF Corporation supplies IET with materials used during the remediation process), IET fails to describe the nature or relevance of the potential witnesses' statements. *Id.* at 11-12.

In response, plaintiffs identify three potential witnesses who either have offices in or near Chicago. They list Mr. Scott MacFabe of Malcolm Pirnie Inc., Dr. John Haselow and/or Mr. Steve Mark Markesic of Redox Tech LLC, and Dr. Gerald Eykolt. Pl. Opp. 12. However, other than briefly describing who each of these individuals is, plaintiffs fail to disclose the subject matter of the witnesses' testimony.

Here, neither party has sufficiently identified key witnesses with the requisite amount of detail. Without more, this factor is neutral.

e. **Convenience of the Parties**

In assessing the convenience of the parties, the court may consider the parties' respective residences and their abilities to bear the expense of litigating in a particular forum. *Clearclad Coatings, Inc. v. Xontal, Ltd.*, No. 98 C 7199, 1999 WL 652030 at *11 (N.D. Ill. Aug. 20, 1999). Regardless of whether the case is tried in the Northern District of Illinois or the Eastern District

of Pennsylvania, EnviroMetal, a Canada corporation, will have to undertake the burden of traveling to either Chicago or Philadelphia. In addition, because IET is a Pennsylvania corporation with its principal place of business in Pennsylvania, the majority of IET's witnesses are employed and reside in Pennsylvania. Importantly, Pennsylvania is IET's home turf where as Illinois is not a home turf for Canada-based EnviroMetal. As such, this factor strongly favors transfer.

2. **Public Interest Factors - Interests of Justice**

With respect to the interest of justice inquiry, the court generally focuses on judicial economy rather than the litigants' or witnesses' private interests. *Koos, Inc. v. Performance Indus., Inc.*, 747 F. Supp. 487, 491 (N.D. Ill. 1990). Relevant considerations include the forum's relationship to the cause of action, the court's familiarity with the applicable law and the speed at which a case will proceed to trial. *Dunn*, 864 F. Supp. at 66, *Plotkin* 168 F. Supp. 2d at 904. Further, even where the private interest factors - the convenience of the parties and witnesses - may support a different outcome, the interests of justice may be determinative in particular cases. *Coffey*, 796 F.2d at 220. Here, for the reasons discussed below, the interests of justice support a transfer.

a. **Relationship to Cause of Action and Familiarity with Law**

This district has a weak relationship to the cause of action brought by Adventus and EnviroMetal. Generally speaking, Illinois has a strong interest in adjudicating injuries to the intellectual property rights of its corporate citizens. However, neither of the remaining parties - EnviroMetal or IET - is an Illinois corporation or has its principal place of business in Illinois. Adventus, which has no standing, is the only connection either plaintiff has to Illinois. EnviroMetal is a corporation with its principal place of business in Ontario. Thus, the dispute is between a Canada corporation and IET, which is a Pennsylvania corporation with its principal place of business in Pennsylvania. More importantly, the infringement alleged by plaintiffs did

not take place in Illinois and Illinois has little interest in adjudicating injuries that do not occur within its borders. *See Coolsavings.com, Inc.*, 53 F. Supp. 2d at 1005 (stating "Illinois has a strong interest in adjudicating injuries that occur within the state"). Although an Illinois federal court would be as familiar with patent law as a Pennsylvania federal court, Illinois' tenuous relationship to this cause of action weighs in favor of transfer. Therefore, these two factors favor transfer.

### b. Speed at Which the Case will Proceed to Trial

The speed at which this case would proceed in Illinois or Pennsylvania does not weigh in favor of either forum. The two most relevant statistics for the purposes of transfer are: (1) the median months from filing to disposition; and (2) the median months from filing to trial. *Brandon Apparel Group v. Quitman Mfg. Co.,* 42 F. Supp. 2d 821, 834 (N.D. Ill. 1999). The Federal Court Management Statistics Report for the annual period ending September 30, 2006[2] indicates that the median time from filing to disposition of civil cases is 6.5 months in the Northern District of Illinois and 1.0 month in the Eastern District of Pennsylvania. *See* ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS, 2006 FEDERAL COURT MANAGEMENT STATISTICS. In addition, the median time from filing to trial of civil cases is 26.4 months in the Northern District of Illinois and 18.0 months in the Eastern District of Pennsylvania. *See id.* Based on these statistics, the average case is disposed of more quickly in the Eastern District of Pennsylvania and, therefore, this factor weighs in favor of transfer.

---

[2] Rather than citing Federal Court Management Statistics, the parties have cited Federal Judicial Caseload Statistics, both found at http://www.uscourts.gov/library/statisticalreports.html. These statistical reports are different, but comparable. The Federal Court Management Statistics are for a 12-month period ending September 30, 2006 and the Federal Judicial Caseload Statistics are for a 12-month period ending March 31, 2006. The median time intervals published are similar. For example, the median time from filing to trial of civil cases for the Northern District of Illinois for the period ending September 30 is 26.4 is comparable to 25.5 months for the period ending March 31. In addition, although the parties have cited to the statistics for 2005, the court has relied on the most current statistics available.

In summary, after carefully weighing the private and public interests, the court concludes that IET has demonstrated that transferring this action to the Eastern District of Pennsylvania is "clearly more convenient." Therefore, IET's motion to transfer this action to the Eastern District of Pennsylvania is granted.

III. **Conclusion**

For the reasons stated above, the defendant's motion to dismiss [18] is granted in part and denied in part. Specifically, the motion to dismiss under Rule 12(b)(1) as to Adventus is granted because Adventus does not have standing; the motion to dismiss for lack of personal jurisdiction and improper venue under Rules 12(b)(2) and (3) is denied; and the motion to transfer this action to the United States District Court for the Eastern District of Pennsylvania is granted.

DATE:   March 5, 2007

Blanche M. Manning
United States District Court Judge